We conclude that, from the evidence as it stood when the plaintiff rested her case, no cause of action had been shown against the defendant. It appeared that he was not justified in selling the property which it is claimed he should have sold. Therefore the nonsuit was properly granted, and the judgment must be affirmed.

. Judgment affirmed, with costs. All concur.

---

(34 Misc. Rep. 564.)

### O'CONNOR v. PRESS PUB. CO.

(Supreme Court, Trial Term, Kings County. April, 1901.)

LIBEL—VERDICT—PUBLIC POLICY.

On a trial for libel, based on a publication of defendant charging that plaintiff entered a house and stole property therefrom, a verdict in his favor for substantial compensatory damages will be set aside, as against public policy, where the real purpose of his entry was to commit the crime of statutory rape on an infant daughter of the owner.

Action by John O'Connor against the Press Publishing Company. Verdict for plaintiff, and new trial ordered.

Fenton Rockwell and J. Stewart Ross, for plaintiff.
Bowers & Sands, for defendant.

RUSSELL, J. This case is unique in suits for libel and the allowance of compensation by the jury for defamation of character, and care should be taken by the courts to avoid a false precedent. The plaintiff, a young man of 24, was on the 4th day of August, 1897, employed in a livery stable in Brooklyn. That evening the World newspaper published of him the following article:

"Stolen Kisses a Thief's Ruin—Tempting Lips of a Pretty Girl Asleep Were Too Much for Him—Broke Her Slumbers—Burglar O'Connor Identified by Miss Jessie Whartman, of Brooklyn.

"John O'Connor can steal silverware in safety, but when he stole a kiss he made trouble for himself. O'Connor is a burglar, the Brooklyn police say, and they claim he is one who kept them in hot water for a long time. So long as he did not infringe on the ethics of his profession, they say, he worked in safety, and they could not find him. But, when he allowed the tempting lips of a pretty girl asleep in a house he was robbing to lead him from the straight and narrow path, then he imperiled his liberty. John did all right and robbed as all good burglars should until the night of July 24th. Then, the police say, he picked out the house of Frederick Whartman, at 84 Himrod avenue, Brooklyn, for robbery. If he had known what was coming, he probably would not have done it; but, when he made his plans, O'Connor knew nothing of Jessie Whartman's fascinations. All that he knew at that time was that Mr. Whartman was rich, and that in the house he would find silverware and other things worthy of the effort of a burglar. So Burglar John got into the house and searched the lower floors. He found table plate and many articles that pleased him, and these he packed in a bag, and placed close to a window which he had opened, and through which he had arranged to escape. He went into Mr. Whartman's rooms and annexed a few articles. Then he visited other rooms and found nothing. At last fate led him to the chamber occupied by Miss Jessie Whartman. Miss Jessie is sixteen years old and a beauty. As she lay asleep, her hair lay tumbled about her pretty shoulders. John caught a glimpse of her lips and was tempted. So, as Jessie slept, John bent over and pressed his lips to hers. With a frightened cry,

the girl awoke. Then John took another kiss and fled. As he went through the window he had left open, he grabbed the bundle of silverware and took it with him. He would not have been caught, had it not been for the kiss. There was no clue for the police to follow, save Miss Jessie's description of the man who kissed her. They followed that, and they caught O'Connor, and Miss Jessie identified him."

The main defense was justification. It failed in proving that plaintiff was a burglar for the purpose of looting silverware. He only entered the house of a father to complete the ruin of his daughter, a child of 15 years. The jury thereupon awarded the plaintiff $500 by way of compensation, they being instructed by the court to allow no punitive damages.

A burglar is one who breaks into a house with intent to commit a crime, even though but little force be used in the breaking. Was the mistake in charging the intent to be the theft of silverware,—a sordid crime,—instead of the commission of rape upon a girl of tender years, so substantial as to justify compensation to the amount of $500? Or if the evidence, quite convincing though it was, did not reach the certainty that the plaintiff actually broke in at midnight, so as to deprive the jury of the right to find otherwise, does the omission to open a shutter or break a latch add sufficient moral strength to plaintiff's case to justify such a verdict for him, though he was guilty of persistently seeking the girl in the father's house for seduction, she being too young to consent or know the ruin awaiting her, and though such act of his was the commission of rape? The plaintiff confessed his unlawful intercourse with the child. He admits that she was at first accessible to him as a girl attending the contiguous public school, and that he took advantage of her inexperience, by his solicitation, successfully operating upon the earliest temptations of sexual passion, unfortified by the wisdom of maturity, and unsustained by sufficient knowledge of the evil or growth of power of will to resist the enticement of opportune temptation. How, then, has his real character suffered by calling him a burglar with intent to thieve, instead of a burglar with intent to ravish, or a ravisher entering a peaceful home with the malignant purpose in his heart? What is the injury by libel? Is it the actual wrong to the character of the man, or the lowering of a false reputation for honor and good conduct? The character is what the man is; the reputation, what he is supposed to be. For defamation, compensation goes to equalize the diminution of reputation below the real worth of the character. And, when it appears that the actual offense is greater in culpability, ethically and legally, than the one to which an incorrect name was given, substantial compensation for the mistake in publication would award a profit for a supposed, but false, reputation, instead of adequate restoration for a loss. The real impairment of veritable character is the true basis upon which the remedy rests. To show that no injury to actual character has been sustained by a mistaken charge of theft in particular, the general reputation of the man for thievery may be proven. Drown v. Allen, 91 Pa. 393. Had the newspaper published the bald, bare facts of plaintiff's crime exactly as proven on the trial, would it have been better for plaintiff's repute? Would he have stood higher in the esteem of just men and women? Has his real character suf-.

fered by the mistake in stating the name of the crime? This is not a case where the libel makes one charge, and the evidence applies to a very different offense, or an attempt, under cover of some weakness of conduct which might dread exposure, to distort the facts for unjust injury. The facts printed and pleaded show the events out of which the real crime appears. That crime was the offense committed against the personal rights of the family as well as the child. When the plaintiff opened to the eye of the law in a legal investigation the actual events from which the truth or falsity of the charge would be displayed, he voluntarily threw open to the light all that he did for which he might be condemned. Nor were the jurors justified in accepting the plea of counsel that the seduction was merely a "youthful indiscretion." The accomplishment of a lifelong disgrace to a child not old or wise enough to comprehend the lasting effects, by the exercise of superior arts and a greater worldly wisdom, united with the force of sexual temptation, was not a youthful indiscretion. Morality condemns such a deed. The law brands it as a crime. The argument of counsel for plaintiff that the marriage of plaintiff to the unfortunate girl months afterwards atoned for the wrong he had wrought may have misled the jury, but in no wise meets the issue involved. For the girl it was a hard alternative. It was the choice between a partial restoration of womanly standing, and a life with plaintiff till severance by death. It is no reflection on the father that it was consummated without his consent. The fact of the marriage at a later date does not affect the rights or liabilities of the defendant fixed by its publication August 4, 1897. Nor does the consent of the plaintiff to such marriage while he was still under the force of a suspended sentence for his confessed offense throw back upon his prior acts the modifying brightness of an error from impulse or momentary forgetfulness of honor. Because, therefore, a substantial recovery here is destructive of the benign principles on which the law awards compensation for defamation of character, and because that law will not allow a profit from the results of wickedness, on the ground that such a result is antagonistic to public policy, a new trial is directed.

New trial directed.